UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AES-APEX EMPLOYER SERVICES, INC.,
and AES-APEX EMPLOYER SOLUTIONS, INC.,

      Plaintiffs,                             Civil Action No. 13-14519
                                               Honorable Robert H. Cleland
v.                                         Magistrate Judge David R. Grand

DINO ROTONDO, RICHARD MARK, and
UNITED STATES, DEPARTMENT OF
TREASURY – INTERNAL REVENUE SERVICE,

      Defendants,

and

AKOURI INVESTMENTS, LLC,

      Intervening Party.
_____/

**REPORT AND RECOMMENDATION TO DENY SUMMARY JUDGMENT
MOTIONS FILED BY DEFENDANT UNITED STATES OF AMERICA AND
INTERVENOR AKOURI INVESTMENTS, LLC [44, 45], AND TO GRANT IN
PART AND DENY IN PART PLAINTIFFS' MOTION TO INTERPLEAD
FUNDS, FOR DISMISSAL, AND FOR COSTS AND ATTORNEY FEES [46]**

**and**

**ORDER DENYING MOTION TO STRIKE [64]**

I.      **REPORT**

    A.    **Background**

On October 1, 2013, Plaintiffs AES-Apex Employer Services, Inc. and AES-Apex

Employer Solutions, Inc. (collectively the "AES Plaintiffs") filed a complaint for interpleader

and declaratory judgment against Defendants Dino Rotondo ("Rotondo"), Richard Mark

("Mark"), and the United States Department of Treasury-Internal Revenue Service ("IRS") in the

Oakland County Circuit Court.  (Doc. #1).  The AES Plaintiffs' complaint was removed to this Court by the IRS on October 29, 2013.  (*Id.*).  On August 1, 2014, this Court granted a motion to intervene filed by Akouri Investments, LLC ("Akouri") (Doc. #32), and on August 15, 2014, Akouri filed an intervenor complaint against the other parties (Doc. #33).

**B.    The Relevant Parties and Entities**

As set forth above, the AES Plaintiffs consist of two corporations – AES-Apex Employer Services, Inc. and AES-Apex Employer Solutions, Inc.  (Doc. #1 at 7-8).  The AES Plaintiffs are owned by David Otto ("Otto").  (Doc. #45 at 92).  Defendant Rotondo previously was the sole owner of two businesses – Apex Administrative Services ("Apex Admin") and People Plus Management Services Group ("PPMSG") – that provided Professional Employer Organization ("PEO") services to numerous clients.  (Doc. #1 at 9).  In May 2011, Intervenor Akouri loaned money to PPMSG in exchange for security interests in the assets of both Apex Admin and PPMSG.  Later, in March 2012, Defendant Mark provided financing for both Apex Admin and PPMSG in exchange for a security interest in these businesses.  (*Id.*).

In March 2013, the AES Plaintiffs bought from Rotondo four limited liability companies that were wholly owned by Apex Admin:  Apex HR Services, LLC; Pinnacle HR Services, LLC; AS Holdings Group, LLC; and AS South, LLC (collectively, the "Directional Entities," as the parties refer to them).  (*Id.* at 9-10).  As part of the consideration for the purchase, the AES Plaintiffs agreed to pay Rotondo certain "Consulting Fees" in accordance with consulting agreements that were executed at the same time.  (*Id.*).  Broadly speaking, these Consulting Fees are calculated based on the gross profits derived by the AES Plaintiffs from providing PEO services to customers acquired from the Directional Entities.  (*Id.*).

The AES Plaintiffs recognize that they owe Consulting Fees to Dino Rotondo under the

2

terms of the consulting agreements and claim that the amount owed is $82,977.00.[1]  (Doc. #46 at

13).   However, the IRS, Mark, and Akouri each claim an interest in those Consulting Fees;

generally speaking, the IRS asserts it is entitled to the Consulting Fees because it has filed tax

liens against Rotondo, while both Mark and Akouri claim entitlement to the Consulting Fees

because they have security interests in the assets of Apex Admin (which owned the Directional

Entities sold by Rotondo to the AES Plaintiffs).   In light of this dispute, the AES Plaintiffs

commenced this interpleader action, and have now requested permission to deposit the

$82,977.00 in Consulting Fees with the Court.  (Docs. #1, 46).   Assuming the Consulting Fees

are properly calculated and deposited with the Court, the ultimate issue is determining which of

these parties should receive those monies.   The relevant facts, as well as the parties' arguments,

are discussed in greater detail below.

    **C.**    **The Relevant Facts**

        *1.*    *The Akouri Loan to PPMSG*

James Akouri ("Mr. Akouri") is the sole member and owner of Intervenor Akouri.  (Doc.

#45 at 89).  On May 1, 2011, Akouri loaned $200,000 to PPMSG and authorized PPMSG to

draw on an additional line of credit up to $250,000 (the "Akouri Loan").[2]   (*Id.*).   To induce

Akouri to make the loan to PPMSG and to extend additional credit, Apex Admin guaranteed the

loan.   (*Id.* at 55-58).   The Akouri Loan was secured by written security agreements of both

PPMSG and Apex Admin, pledging all assets of both of these entities.   (*Id.* at 47-53, 60-66).

Defendant Rotondo signed all of the loan agreements, promisory notes, security agreements, and

guaranties in his individual capacity and/or corporate capacity for PPMSG and Apex Admin.

---

[1] Akouri and Mark dispute the accuracy of this figure, which apparently continues to increase as
Rotondo earns additional Consulting Fees.  This issue is discussed in greater detail below.

[2] Subsequent amendments to the loan agreement increased the total size of the Akouri Loan to
$1.4 million.  (Doc. #45 at 89-90).

(*Id.* at 89). On May 9, 2011, Akouri perfected its security interest in "All Assets of" PPMSG and Apex Admin by filing and recording "blanket" UCC financing statements. (*Id.* at 68-69, 89). Thus, it is undisputed that Akouri acquired its position as a secured creditor of both PPMSG and Apex Admin when it filed these financing statements.[3]

### 2.   *Mark's Loan to Apex Admin and PPMSG*

Akouri asserts that, in early 2012, it learned that Rotondo was seeking additional financing for PPMSG and Apex Admin, and that Rotondo was engaged in negotiations with Mark to obtain a loan (the "Mark Loan"). (*Id.* at 90). Akouri asserts that, at that time, Mr. Akouri met with Rotondo and Mark to discuss the Mark Loan. (*Id.*). Mr. Akouri claims he informed Mark that Akouri held a blanket security interest in the assets of Apex Admin and PPMSG, which had priority over any liens Mark might obtain in connection with the Mark Loan. (*Id.* at 90-91). Akouri further alleges that Mark indicated that he wanted the protection of a lien against the assets of PPMSG and Apex Admin that would give him priority over Akouri's liens. (*Id.* at 91). According to Mr. Akouri, he told both Mark and Rotondo that Akouri would not release its senior lien position until the full amounts due under the Akouri Loan were repaid, nor would it subordinate its priority security interest to Mark. (*Id.*).

Akouri asserts that, despite its refusal to subordinate its liens, and without its knowledge, on March 30, 2012, PPMSG, Apex Admin, and Mark entered into an agreement to make the Mark Loan (in the amount of $1,350,000).[4] (*Id.* at 100-04). That same day, Apex Admin and PPMSG executed a security agreement in favor of Mark, paragraph 2 of which expressly

---

[3] Because, as discussed below, it is Akouri's interest in the assets of *Apex Admin* that is principally at issue, the Court will primarily focus the remainder of its analysis on this security interest (as opposed to Akouri's security interest in PPMSG).

[4] It appears that Mark agreed to transfer new funds to PPMSG and Apex Admin in the amount of $1,000,000 and to incorporate an existing $350,000 balance due under a prior agreement. (*Id.* at 100-04).

4

acknowledges Akouri's senior lien, stating:

> 2.     GRANT OF SECURITY INTEREST IN COLLATERAL.   To secure payment of the Indebtedness, [Apex Admin and PPMSG] grant [Mark] a continuing security interest in all of the following assets and property of [Apex Admin and PPMSG], wherever located and whether now owned or existing or hereafter arising or acquired, **subject only to the Unsubordinated Akouri Security Interest** (defined in Section 3.4 below) ….

(*Id.* at 100 (emphasis added)).  Section 3.4 of the security agreement then represents that Mark

had obtained Akouri's agreement to subordinate its loans, saying:

> 3.4     Title to Collateral.   [Apex Admin and PPMSG] have good and marketable title to the Collateral, free and clear of any liens, encumbrances or security interests whatsoever, other than a security interest created in favor of Akouri Investments, LLC, a Michigan limited liability company ("Akouri"), in connection with a loan made by Akouri to PPMSG, which was guaranteed by Apex and secured by a Security Agreement executed by Apex in favor of Akouri covering Apex's Collateral (the "Akouri Security Interest").   **The parties acknowledge and agree that a portion of the Akouri Security Interest has been subordinated to the security interest granted by this Agreement pursuant to a separate Subordination Agreement by and between Akouri and [Mark].**  [Mark's] security interest in the Collateral is junior only to the portion of the Akouri Security Interest not subordinated under the Subordination Agreement to the security interest granted hereunder (the "Unsubordinated Akouri Security Interest"), and [Apex Admin and PPMSG] will keep the Collateral free of all other liens, encumbrances and security interests.  [Apex Admin and PPMSG] will defend the Collateral against all claims and demands of all persons at any time claiming any interest in the Collateral except for Akouri with respect to the Unsubordinated Akouri Security Interest ….

(*Id.* at 101 (emphasis added)).

Akouri asserts that, *after* Mark wire-transferred funds to Apex Admin and PPMSG,

Mark's attorney, Eric Bean ("Bean"), sent to Akouri a proposed subordination agreement that

would have subordinated a portion of the Akouri Loan to the Mark Loan.  (*Id.* at 80-82, 91).  Mr.

Akouri indicates that he expressly advised both Bean and Rotondo that he had not signed – and

would not sign – the subordination agreement.  (*Id.* at 91).  Then, after informing Bean and

Rotondo that he would not subordinate any portion of Akouri's liens to the liens securing the Mark Loan, Mr. Akouri apparently left the State of Michigan to go on vacation. (*Id.* at 23).

On April 4, 2012, while Mr. Akouri was out of state, Bean filed and recorded a UCC financing statement on behalf of Mark, asserting a lien against all assets of Apex Admin and PPMSG. (*Id.* at 84-86). Despite the fact that Akouri had refused to sign the proposed subordination agreement, Mark's UCC filing statement indicated that Akouri had voluntarily agreed to subordinate its liens, stating:

> Pursuant to the terms of a certain Subordination Agreement dated as of March 30, 2012 by and between Secured Party (Richard Mark) and Akouri Investments, LLC, a Michigan limited liability company ("Akouri"), Akouri has agreed to subordinate its security interest in all assets of [Apex Admin and PPMSG] … to the security interest secured hereby up to the amount of One Million Dollars ($1,000,000.00).

(*Id.* at 86). At oral argument on the pending motions, counsel for Mark conceded that no such *signed* subordination agreement exists or ever existed.[5]

### 3.   *The Asset Sale to the AES Plaintiffs*

Akouri asserts that, in early 2013, before the Akouri Loan was repaid, Rotondo began negotiating an asset sale with Otto whereby the AES Plaintiffs (which Otto owned) would buy "the assets of PPMSG, Apex Admin, [and the Directional Entities]" (all of which were owned/controlled by Rotondo). (Doc. #45 at 92). Mr. Akouri asserts that, at a meeting with key parties (including Rotondo, Mark, and Otto), he made clear that Rotondo could not sell the assets of Apex Admin, PPMSG, or any of the Directional Entities, prior to it (Akouri) being repaid in full the $1.4 million it was then owed by PPMSG and Apex Admin. (*Id.* at 92-93).

Nevertheless, on March 28, 2013, asset purchase agreements were executed between "People Plus" (the "registered assumed name" for the business conducted by Apex Admin, and

---

[5] Akouri provided the Court with the unsigned (and undated) Subordination Agreement that Mark had proposed. (*Id.* at 80-82).

6

the four Directional Entities) and one of the AES Plaintiffs, AES-Apex Employer Services.  (*Id.* at 106-40).  Via these transactions, the assets sold to AES-Apex Employer Services consisted of customer accounts for the provision of PEO services (the "Customer Accounts") that were purportedly owned by the Directional Entities (each of which, as noted above, was a wholly owned subsidiary of Apex Admin).  Akouri claims that, notwithstanding these transactions, it retains its senior lien on the assets of Apex Admin, which it contends includes the Customer Accounts, either "directly" because those accounts are really an asset of Apex Admin (and thus covered by Akouri's security interest in the assets of that company) or "indirectly."[6]  Thus, at bottom, Akouri asserts that the Customer Accounts were sold in an improper attempt to eliminate the value of Akouri's security interest in the assets of Apex Admin.  (*Id.* at 25).

4.    *The Competing Claims for the Consulting Fees*

As set forth above, by virtue of the asset purchase agreements, one of the AES Plaintiffs, AES-Apex Employer Services, acquired Customer Accounts purportedly owned by the Directional Entities.  The asset purchase agreements include schedules identifying the seller of each Customer Account; a total of 67 such accounts are identified, but – at least according to the schedules – none of these accounts were owned by or purchased from Apex Admin.  (Doc. #63-3).  Because Rotondo had ongoing relationships with these Customer Accounts, the AES Plaintiffs and Rotondo executed consulting agreements on March 28, 2013, in connection with the asset purchase agreements.  (Doc. #45 at 143-44).  In accordance with these agreements, the AES Plaintiffs agreed to pay Rotondo certain Consulting Fees on an ongoing basis.  (*Id.*).  Again, it is these Consulting Fees that are the subject of the instant dispute.

---

[6] In short, Akouri argues that because Apex Admin owns the Directional Entities, Akouri's security interest in the assets of Apex Admin gives it a security interest in the assets of the Directional Entities.  This flawed argument is discussed in detail below.

On April 3, 2013, the IRS served a Notice of Levy on the AES Plaintiffs, in the amount of $189,472.52, seeking payment of this amount of Consulting Fees in connection with Rotondo's past due tax liability.  (Doc. #44-2 at 9).  On July 25, 2013, the IRS received a check from the AES Plaintiffs for $38,414.54, which was applied to Rotondo's unpaid tax debts.  (*Id.*).  On September 10, 2013, the IRS issued a second Notice of Levy against the AES Plaintiffs, claiming a total amount due of $744,613.98.  (*Id.*).  The IRS asserts that it is entitled to the Consulting Fees because Rotondo is indebted to it for various unpaid taxes associated with his involvement in PPMSG, Apex Admin, and the Directional Entities.  (Doc. #44).[7]

On August 12, 2013, Akouri filed a lawsuit against various entities (including PPMSG, Apex Admin, and Rotondo) in the Oakland County Circuit Court (Case No. 13-135638-CB) (the "State Court Action").  (Doc. #33 at 13-91).  Apparently, Akouri secured consent judgments against PPMSG, Apex Admin, and Rotondo in the State Court Action on December 3, 2013.  (*Id.* at 7).  On February 11, 2015, however, the Honorable James M. Alexander granted the AES Plaintiffs' motion for summary disposition in the State Court Action, dismissing all of Akouri's claims against the AES Plaintiffs for reasons that will be discussed in greater detail below.  (Doc. #58-1).  On April 3, 2015, Judge Alexander denied Akouri's motion for reconsideration.  (Doc. #67-2).  On June 23, 2015, Akouri filed a claim of appeal with the Michigan Court of Appeals, which remains pending.  (Doc. #76 at 30).

---

[7] On July 30, 2013, Mark filed a complaint against Rotondo in the Oakland County Circuit Court.  (Doc. #44-1 at 8-9).  On August 2, 2013, Mark obtained a consent judgment against Rotondo, and on August 5, 2013, he served writs of garnishment on the AES Plaintiffs in the amount of $1,350,000.  (*Id.*).  In filings with this Court, Mark has claimed an interest in the Consulting Fees based on these writs of garnishment.  (Doc. #53 at 10-11).  Mark has not moved for summary judgment on this basis, however, so the Court need not address the merits of this claim in detail.

5.      *The Instant Interpleader Action*

In the meantime, the AES Plaintiffs filed the instant lawsuit in state court, seeking to interplead the Consulting Fees they are obligated to pay Rotondo.  (Doc. #1).  Named as defendants in this lawsuit, which was removed to federal court by the IRS, are Rotondo, Mark, and the IRS.  (*Id.*).  On December 4, 2013, Mark and the IRS filed answers to the AES Plaintiffs' complaint.  (Docs. #9, 10).  Rotondo failed to answer or otherwise claim a right to the proceeds. The Clerk of Court entered a default, and later a default judgment against Rotondo.  (Doc. #13, 17).  Subsequently, however, Rotondo filed a motion to set aside the default judgment (Doc. #23), which the Court granted (Doc. #26).

On August 1, 2014, Akouri was permitted to intervene (Doc. #32); it now asserts, *inter alia*, claims against the AES Plaintiffs and Rotondo for violation of the Michigan Uniform Fraudulent Transfer Act.  (Doc. #33).  Thus, in its intervenor complaint, Akouri is asking this Court to set aside as fraudulent the transfer of assets to the AES Plaintiffs via the March 28, 2013 asset purchase agreements.  (*Id.*).  Akouri also pleads a claim for "Declaratory Judgment," seeking a declaration by the Court that its interest in the Consulting Fees is superior to that of Mark and the IRS and, therefore, that it is entitled to the Consulting Fees.  (*Id.*).

**D.      The Pending Motions**

On January 15, 2015, the AES Plaintiffs filed a motion to interplead funds, for dismissal, and for costs and attorney's fees.[8]  (Doc. #46).  In their motion, the AES Plaintiffs assert that they should be permitted to deposit the Consulting Fees with the Court and should then be dismissed from this action.  They also request an award of costs and fees.  The IRS filed a

---

[8] The AES Plaintiffs also asked this Court to stay the State Court Action.  (Doc. #46 at 14-17). However, their request is now a moot point; after Judge Alexander issued an Order on February 11, 2015, dismissing Akouri's claims against them, the AES Plaintiffs withdrew their request. (Doc. #63 at 2).

response to this motion (Doc. #49), to which the AES Plaintiffs replied (Doc. #62); Akouri filed

a response (Doc. #51), to which the AES Plaintiffs replied (Doc. #63); and Mark filed a response

(Doc. #53), to which the AES Plaintiffs did not reply.

Also on January 15, 2015, the IRS filed a motion for summary judgment, asserting that it

is entitled to the Consulting Fees because its federal tax liens take priority over all of the

competing interests. (Doc. #44). The AES Plaintiffs, Akouri, and Mark all filed responses to the

IRS' motion (Docs. #50, 52, 53), and the IRS filed a single reply brief (Doc. #58).

Finally, on January 15, 2015, Akouri filed a motion for partial summary judgment,

seeking a declaratory judgment that it is entitled to the Consulting Fees because it has the first-

in-time perfected security interest in the assets of Apex Admin. (Doc. #45). The IRS, the AES

Plaintiffs, and Mark all filed responses to this motion. (Docs. #49, 50, 53). Akouri then filed

three separate reply briefs in support of its motion. (Docs. #59, 60, 61).

These three dispositive motions have been referred to the undersigned for a report and

recommendation pursuant to 28 U.S.C. §636(b)(1)(B). (Doc. #82).

### E.     The Applicable Legal Standards

When reviewing cross-motions for summary judgment, the court must assess each motion

on its own merits. *See Federal Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d

487, 493 (6th Cir. 2005). Federal Rule of Civil Procedure 56 provides: "The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*

*Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir.

2011). A fact is material if it might affect the outcome of the case under governing law. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine

issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). As set forth above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where

11

the moving party has the burden – the plaintiff on a claim for relief or the defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986) (internal citations omitted). Accordingly, summary judgment in favor of the movant "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Harris v. Kowalski*, 2006 WL 1313863, at *3 (W.D. Mich. May 12, 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

### F.    Analysis

Faced with three competing motions, each of which is at least partially case dispositive, the Court must answer several questions, including: whether the AES Plaintiffs should be permitted to interplead the Consulting Fees (and, if so, whether they should then be dismissed from this action and permitted to recover costs and attorneys' fees); and whether the Court can determine, at the summary judgment stage, who – among the IRS, Mark, and Akouri – is entitled to the Consulting Fees.

> 1.    *The AES Plaintiffs' Motion to Interplead Funds,
> For Dismissal, and For Costs and Attorneys' Fees*

> a.    *The AES Plaintiffs Should Be
> Permitted to Interplead the Consulting Fees*

In their motion, the AES Plaintiffs request leave of court to interplead the Consulting Fees accrued to date.[9]  (Doc. #46 at 4).  At the time of the filing of their motion, the AES

---

[9] The AES Plaintiffs' request is made under 28 U.S.C. §1335 (so called "statutory interpleader"). (Doc. #46 at 4). Akouri argues, however, that the funds should be interpleaded pursuant to Fed. R. Civ. P. 22 ("rule interpleader"). (Doc. #51 at 22-24). The Court agrees with Akouri. The AES Plaintiffs initially filed this action in the Oakland County Circuit Court pursuant to M.C.R. 3.603. (Doc. #1). The IRS removed the case to federal court pursuant to 28 U.S.C. §1442(a)(1) and 28 U.S.C. §1444. (*Id.*). The AES Plaintiffs never amended their complaint to plead a cause of action under 28 U.S.C. §1335, and any attempt to do so would have been futile, as that statute requires the presence of two or more adverse claimants of diverse citizenship, which is not

Plaintiffs indicated that the amount to be interpleaded into the registry of the Court, and held by the Court pending resolution of the parties' competing claims to the Consulting Fees, was $82,977.00.[10]   (*Id.*).   The AES Plaintiffs also indicate in their motion that the Consulting Fees will continue to be earned by Rotondo for an undetermined period of time.   (*Id.*).   None of the other parties oppose the AES Plaintiffs' request to interplead the Consulting Fees.

Interpleader is a procedural device whereby a party holding money or property concededly belonging to another may, in a single suit, join two or more parties asserting mutually exclusive claims to the money or property.  *See* Fed. R. Civ. P. 22.  The stakeholder is thereby freed from the threat of multiple liability and/or the vexation of multiple lawsuits.  *See Michigan Teamsters Joint Council No. 43 v. Bufalino*, 626 F. Supp. 51, 53 (E.D. Mich. 1985).  In *First Trust Corp. v. Bryant*, 410 F.3d 842, 852, n. 6 (6th Cir. 2005), the Sixth Circuit noted that stakeholders should be permitted to deposit the disputed funds with the court or post bond pending adjudication on the merits as to who is the rightful owner of the underlying funds.  Thus, in this case, where (1) the AES Plaintiffs seek to interplead the disputed funds with the Court, (2) no other party objects to this request, and (3) this Court has the discretion to enter such an order pursuant to Fed. R. Civ. P. 22, the Court finds it appropriate to order the deposit of the Consulting Fees accrued to date with the Court.  Accordingly, the Court should grant this portion of the AES Plaintiffs' motion.

---

present here.  Thus, interpleader is more appropriate under Fed. R. Civ. P. 22 in this case.

[10] Both Akouri and Mark dispute this figure, contending that, based on the gross profits received by the AES Plaintiffs, consulting fees of approximately $15,000-$17,000 per month should have been generated since April 2013.  (Doc. #51 at 24-25; Doc. #53 at 16).  Thus, Akouri and Mark ask the Court to order the AES Plaintiffs to provide a detailed accounting, showing the manner in which the Consulting Fees have been calculated, as well as supporting financial documentation. (Doc. #51 at 24-25; Doc. #53 at 16).  Under the circumstances, where counsel for the AES Plaintiffs acknowledged at oral argument that their figure reflects a unilateral deduction for attorneys' fees and costs incurred in this action (as well as the State Court Action), the Court recommends ordering the requested accounting.

> b.   *The AES Plaintiffs Should Not Be Dismissed from the Action*

The AES Plaintiffs also request that after they deposit the accrued-to-date Consulting Fees, they be discharged from this action, subject to an order requiring them to deposit future Consulting Fees earned by Rotondo into an escrow account to be distributed pursuant to the Court's eventual order resolving the competing claims for these amounts.  (Doc. #46 at 4-5 (citing 28 U.S.C. §2361)).  Specifically, the AES Plaintiffs argue as follows:

> Pursuant to 28 U.S.C. §2361, the Court "shall hear and determine the case, and may discharge the plaintiff from further liability, make the injunction permanent, and make all appropriate orders to enforce its judgment." Further, a "neutral stakeholder asserting no claim to the disputed funds and having surrendered the disputed funds to the custody of the Court should be discharged from the action."  *Sun Life Assurance Co. v. Thomas*, 735 F. Supp. 730, 732 (W.D. Mich. 1990); *see also* 28 U.S.C. §2361. Absent bad faith or the possibility that the stakeholder is independently liable, "discharge should be readily granted."  *Sun Life Assurance Co.*, at 733.

(*Id.* at 14).   The AES Plaintiffs then assert, in conclusory fashion, that because they "are disinterested, not independently liable, and there has been no bad faith," they are entitled to discharge from this action.  (*Id.*).

The IRS does not oppose the AES Plaintiffs' request for dismissal from this action, provided that they are first ordered to deposit the Consulting Fees with the Court, without deducting any fees or other expenses.[11]  (Doc. #49 at 2).  Akouri, however, argues that the AES Plaintiffs are not "neutral stakeholders" and, thus, should not be dismissed from the action. (Doc. #51 at 26).   Akouri notes that it has filed an intervenor complaint against the AES Plaintiffs, in which it seeks to void the March 28, 2013 asset sales as a fraudulent conveyance. (*Id.* (citing Doc. #34)).

---

[11]  This issue is discussed in greater detail below, as the AES Plaintiffs have asked to be reimbursed for their costs and attorneys' fees associated with this interpleader action, to be paid out of the Consulting Fees.

Under the circumstances, the AES Plaintiffs are not "neutral stakeholders," and it would therefore be inappropriate to dismiss them from this action.  As set forth above, both Mr. Akouri and Rotondo have attested that the AES Plaintiffs negotiated the asset sales with Rotondo in 2013, despite being fully aware of Akouri's position that there could be no such sale before the Akouri Loan was repaid in full.  (Doc. #45 at 92-93, 97).  Akouri further alleges that the AES Plaintiffs drafted the asset purchase agreements in such a way as to structure a sham transaction whereby they paid Rotondo (in the form of hundreds of thousands of dollars in "Consulting Fees") for the Customer Accounts at issue (for which they paid the Directional Entities only $4,000).  (*Id.* at 3-4).  Although Akouri has not shown a strong likelihood of success on the merits of its fraudulent conveyance claim against the AES Plaintiffs, that is not its burden at this stage of the litigation, and it has come forward with at least some evidence that the AES Plaintiffs are neither "neutral" nor "disinterested."  For these reasons, the Court concludes that the AES Plaintiffs are not presently entitled to dismissal from this action.  *See, e.g., William Penn Life Ins. Co. of New York v. Viscuso*, 569 F. Supp. 2d 355, 361 (S.D.N.Y. 2008) ("Where there are multiple claims to the stake as well as counterclaims against the stakeholder, interpleader is proper, and the court may discharge the plaintiff from liability on the stake but retain jurisdiction over the plaintiff for purposes of adjudicating the counterclaims."); *Underwriters Group, Inc. v. Clear Creek Indep. Sch. Dist.*, 2006 WL 1852254, at *5 (S.D. Tex. June 30, 2006) ("Nevertheless, a court may delay or deny discharge of the stakeholder if there are serious charges that the stakeholder commenced the action in bad faith." (internal quotations omitted)).

> c.  *The AES Plaintiffs are Not Entitled to an Award of Costs and Fees*

In their motion, the AES Plaintiffs also argue that they are entitled to recover their costs and attorneys' fees incurred in this interpleader action pursuant to two specific provisions of the

March 2013 asset purchase agreements.  (Doc. #46 at 17; Doc. #62 at 3-6).  In the alternative, the

AES Plaintiffs seek recovery of these amounts pursuant to both state and federal law.  (Doc. #46

at 17 (citing cases)).[12]   The IRS, Mark, and Akouri all argue that the AES Plaintiffs are not

entitled to recover costs and attorneys' fees under any of the theories advanced.  (Doc. #49 at 4-

5; Doc. #51 at 27-29; Doc. #53 at 16).

(1)   <u>Contract Theories for Recovery</u>

The AES Plaintiffs first argue that, under the terms of paragraph 6 of the March 28, 2013

asset purchase agreements, they are entitled to recover costs and attorneys' fees associated with

this interpleader action.  (Doc. #50 at 12-15).  That provision reads as follows:

> 6.    Indemnification
>
> 6.1    Each Seller and Guarantor covenant and agree that,
> regardless of any investigation at any time made by or on behalf of
> Purchaser or of any information Purchaser may have in respect thereof, the
> Sellers and Guarantors will jointly and severally indemnify and hold
> harmless Purchaser from, for and against any loss, damage, liability or
> deficiency (including without limitation, reasonable attorneys' fees and
> other costs and expenses incident to any suit, action, investigation or other
> proceeding) arising out of or resulting from, and will pay Purchaser on
> demand the full amount of any sum which Purchaser may pay or become
> obligated to pay on account of, (i) any false representation or the breach of
> any warranty made by any Seller and/or any of Sellers' Affiliate(s) under
> this Agreement, and Related Agreement, or any closing documents; (ii)
> any federal, state, local or other tax of any nature existing prior to the date
> of Closing and owed by any Seller and/or any of Sellers' Affiliate(s); (iii)
> any failure of any Seller and/or Sellers' Affiliates to perform or observe

---

[12] The AES Plaintiffs also argue, almost in passing, that the Directional Entities' failure to convey clear title on the accounts acquired, combined with the fact that the AES Plaintiffs continue to incur significant attorneys' fees relative to these accounts, constitutes a material breach of the asset purchase agreements, thus alleviating the AES Plaintiffs of any obligation to pay Consulting Fees.  (Doc. #62 at 5-6).  This argument, which was raised for the first time in the AES Plaintiffs' reply brief, and which would require the Court to determine the merits of a unpled breach of contract claim, is not properly before the Court.  *See, e.g., Dothard v. MacLaren*, 2015 WL 470585, at *25 (E.D. Mich. Feb. 3, 2015) (substantive claims raised for the first time in a reply brief would not be considered); *Sims v. Piper*, 2008 WL 3318746, at *5 (E.D. Mich. Aug. 8, 2008) (same).

16

any term, provision, covenant, agreement or condition under the Letter of
Intent, this Agreement, any Related Agreement, or any closing documents
or to be performed or observed by any Seller and/or Sellers' Affiliates;
(iv) any claim, litigation or other action of any nature arising out of any
act performed, transaction entered into or state of facts suffered to exist by
any Seller and/or Sellers' Affiliate(s) prior to the date of Closing; and (v)
without limiting the generality of the foregoing, any claim of any
employee of any Seller and/or Sellers' Affiliate(s), or of any other person,
arising out of or relating to any employee stock option, bonus retirement,
profit sharing, pension or other similar plan of any Seller and/or Sellers'
Affiliate(s) or the operation or termination of any such plan ....

(Doc. #46-3 at 10).  Specifically, then, the AES Plaintiffs argue that this paragraph provides for

payment of their reasonable attorneys' fees and costs "arising out of or resulting from" a lawsuit

involving the subject matter of the agreements, which they contend includes the instant dispute

over the Consulting Fees.  (Doc. #50 at 9 (citing Doc. #46-3 at 10)).  The Court disagrees.

First, it is not at all clear that paragraph 6 provides for recovery of attorneys' fees

stemming from a lawsuit involving the asset purchase agreements.  This paragraph is, at best,

extremely ambiguous.  Moreover, the Court is not persuaded that the instant interpleader action

necessarily "arises out of" or "results from" the March 2013 asset purchase agreements (as

opposed to rights established under federal and/or state law regarding interpleader actions).

Finally, even if the Court accepts the AES Plaintiffs' assertion that this contract provision

envisions recovery of attorneys' fees under the present facts, the AES Plaintiffs' claim for such

fees would be against the Directional Entities, not the IRS or Akouri.  (Doc. #46-3 at 6, 10

("Sellers" and "Guarantors," defined as the Directional Entities, will indemnify and hold

harmless the AES Plaintiffs for and against any loss "arising out of or resulting from" certain

actions)).  Thus, paragraph 6 of the asset purchase agreements does not provide a basis for an

award of costs or fees.

In addition to paragraph 6 of the asset purchase agreements, the AES Plaintiffs also rely

on the following provision in the consulting agreements as support for their claim that they

should be permitted to deduct from the Consulting Fees due Rotondo their costs and attorneys' fees associated with this action:

> In consideration of [Rotondo's] services, [the AES Plaintiffs] shall pay [Rotondo] a fee … equal to seventeen and one-half percent (17.5%) of **gross profits** received by [the AES Plaintiffs] from a Customer acquired from Seller, if the Customer is represented by a PEO broker, or twenty percent (20%) of **gross profits** received by Purchaser from a Customer acquired from Sellers, if the Customer is not represented by a PEO broker (the "Consulting Fee") …. **Gross profits** shall mean revenue received by [the AES Plaintiffs] on a Customer's account, **less (a) direct expenses attributable to the employees leased under the Customer's account** ….

(Doc. #62 at 3 (quoting Doc. #62-2 at 2 (emphasis added by the AES Plaintiffs))).  According to the AES Plaintiffs, then, they may deduct all expenses associated with the servicing of the Customer Accounts – including attorneys' fees "incurred by [the AES Plaintiffs] with respect to these acquired accounts" – <u>before</u> calculating "gross profits" (and, therefore, before calculating the Consulting Fees due to Rotondo).  (*Id.* at 3-4).

The problem with the AES Plaintiffs' argument, however, is that they conflate the phrase "direct expenses attributable <u>to the employees leased</u>" – the language contained in the consulting agreements – with a broader concept of "'direct expenses attributable' <u>to the servicing of the accounts</u>" purchased from the Directional Entities – language that is <u>not</u> contained in the consulting agreements.  (*Id.* (emphasis added)).  Even if the AES Plaintiffs were correct that their costs and attorneys' incurred in this matter are tangentially related to the "servicing of the accounts" they purchased from the Directional Entities, no argument can be made that such costs and fees are "directly" attributable to the actual "employees leased" from the Directional Entities' former customers.  Accordingly, the AES Plaintiffs are not entitled to deduct from "gross profits" their costs and attorneys' fees incurred in this matter.

(2)     Application of State and Federal Law

The AES Plaintiffs also argue that, even if they are not permitted to recover costs and attorneys' fees under contract theories, the Court still has the discretion to enter such an award. Under the federal rules, courts have broad discretion in determining whether to award attorneys' fees out of the deposited proceeds.[13]  *See, e.g., Lutheran Brotherhood v. Comyne*, 216 F. Supp. 2d 859, 863 (E.D. Wis. 2002); *Holmes v. Artists Rights Enforcement Corp.*, 148 F. App'x 252, 257 (6th Cir. 2005) ("[I]n interpleader actions, the award of costs and attorneys' fees is within the sound discretion of the court …."). However, "Courts traditionally have refused to award costs and counsel fees to a stakeholder who is in some way culpable as regards the subject matter of the interpleader proceeding, but not sufficiently culpable to warrant denial of interpleader all together." *United Bank of Denver, Nat. Ass'n v. Oxford Props., Inc.*, 683 F. Supp. 755, 757 (D. Colo. 1988); *see also Lutheran Brotherhood*, 216 F. Supp. 2d at 863 ("Courts have, however, refused to deduct fees from the proceeds when the stakeholder was in some way culpable with respect to the subject matter of the interpleader proceeding.").

Again, the AES Plaintiffs simply claim that they are entitled to recover costs and attorneys' fees because they are disinterested stakeholders who were "forced" to file this lawsuit, at their own expense, or risk the "possibility of multiple liability and/or the vexation of multiple lawsuits …." (Doc. #50 at 2). They claim they are "small businesses who have been forced to

---

[13] The AES Plaintiffs argue that, because the Consulting Fees arise from the asset purchase agreements – which contain an express choice of law provision providing that Michigan law governs the agreement – Michigan law applies to the award of costs and attorneys' fees in this interpleader action. (Doc. #50 at 12). Under the circumstances, this is a distinction without a difference. The applicable Michigan Court Rule provides that, "The court may order that the plaintiff's actual costs of filing the interpleader request, tendering the disputed property to the court, and participating in the case as a disinterested stakeholder be paid from the disputed property or by another party." M.C.R. 3.603(E)(1). Thus, regardless of whether the Court looks to the state or federal rules, it retains the discretion to determine whether an award of costs and fees is appropriate.

spend time and money to participate in this proceeding, which arises out of disputes between parties other than [them]."   (*Id.* at 13).   For the reasons set forth above in Section F(1)(b), *supra*, however, the Court concludes that the AES Plaintiffs are neither "neutral stakeholders," nor "disinterested" parties.   Rather, their alleged culpability in the underlying transaction puts them right in the thick of things.   For these reasons, the Court finds that the AES Plaintiffs' request for an award of costs and attorneys' fees should be denied.[14]

> ### 2.   *Akouri's, Mark's, and the IRS' Competing Claims to the Consulting Fees*

Having determined that the Consulting Fees should be deposited with the Court, the Court must now consider Akouri's, Mark's, and the IRS' competing claims to these funds.   In essence, Akouri argues that it is entitled to the Consulting Fees because it has a senior, perfected security interest in all of the property of Apex Admin (including the Customer Accounts generating the Consulting Fees at issue).   (Doc. #45 at 28-35).   Mark disagrees, arguing that Akouri subordinated its security interest to his.[15]   (Doc. #53 at 11-14).   The IRS also disagrees with Akouri's position, asserting that Akouri did not perfect its security interest in the assets of the entities that allegedly sold the Customer Accounts to the AES Plaintiffs (i.e., the Directional Entities).   (Doc. #49 at 6-8).   As a result, the IRS argues, it is entitled to the Consulting Fees because its notices of federal tax lien were filed against the Directional Entities before Akouri

---

[14] The IRS advances several arguments as to why the AES Plaintiffs should not be awarded costs and attorneys' fees in this case.   (Doc. #49 at 4-5).   Because the Court has determined that such an award is inappropriate under either state or federal law or applicable contract principles, it need not address the merits of the IRS' arguments.

[15] Mark also argues that any security interest Akouri had in PPMSG or Apex Admin was extinguished because the Akouri Loan was satisfied.   (Doc. #53 at 11-12).   Specifically, Mark asserts that Akouri loaned $300,000 to PPMSG and received $685,000 in return.   (*Id.* at 12).   Akouri denies that the Akouri Loan was repaid.   (Doc. #59 at 2-4).   And, by Mark's own admission, the payments made by PPMSG to Akouri were not only "loan payments," but also included such items as insurance payments, car payments, credit card and expense payments, and consulting fee payments.   (Doc. #53-3).   In other words, the evidence presented by Mark belies his assertion that PPMSG repaid in excess of $600,000 of the Akouri Loan.

and/or Mark subsequently perfected their judgment liens against these entities.[16]   (Doc. #44-1 at 12-16).   In order to resolve these issues, the Court must determine whether any material questions of fact exist as to:  (a) whether Akouri subordinated its security interest to Mark's; (b) if not, whether Akouri's perfected security interest in the assets of <u>Apex Admin</u> translates into a security interest in the assets of the <u>Directional Entities</u> (which are owned by Apex Admin); and (c) whether Akouri had a security interest in the Customer Accounts (whether those accounts were owned by the Directional Entities or Apex Admin) that were sold to the AES Plaintiffs (which generate the Consulting Fees).

> a.    *Akouri Did Not Enter into an Enforceable Agreement*
> *To Subordinate Its Security Interest to Mark's*

Mark opposes Akouri's motion for partial summary judgment, arguing that there is a genuine issue of material fact as to Akouri's claim that it did not subordinate its security interest in Apex Admin to Mark.  (Doc. #53 at 12-14).  Specifically, Mark points to the April 4, 2012, UCC financing statement he filed, in which it was stated:

> Pursuant to the terms of a certain Subordination Agreement dated as of March 30, 2012 by and between Secured Party (Richard Mark) and Akouri Investments, LLC, a Michigan limited liability company ("Akouri"), Akouri has agreed to subordinate its security interest in all assets of [Apex Admin] … to the security interest secured hereby up to the amount of One Million Dollars ($1,000,000.00).

(Doc. #45 at 86).  Although there is no signed subordination agreement in the record, and Mark has since conceded that no written subordination agreement exists, he argues that Akouri

---

[16] The IRS also argues that it is entitled to the Consulting Fees because its federal tax liens "have priority over the other parties' judgment liens against the funds, which constitute after-acquired property."  (Doc. #44-1 at 17-21).  The Court notes, however, that the cases cited by the IRS address the competing priorities between federal tax liens and judgment liens.  (*Id.*).  Thus, while this argument might be persuasive if Akouri was resting its claim to the Consulting Fees on its state court consent judgments, it is not particularly relevant to the key issue before the Court, *i.e.*, the import of Akouri's perfected security interest in Apex Admin.

verbally agreed[17] to subordinate its security interest and that such a verbal agreement is enforceable.  (Doc. #53 at 12-14).  The Court disagrees with Mark's legal conclusion.

According to Mark, "As a general rule, unless a statute of frauds applies, an oral contract is enforceable."  (*Id.* at 13 (citing cases)).  Mark then asserts that there is "no statute of frauds applicable to subordination agreements" and "nothing in the Michigan UCC that requires subordination agreements to be signed or in writing."  (*Id.*).  Akouri claims that Mark is "simply wrong" about this, directing the Court's attention to M.C.L. 566.1, which provides as follows:

> An agreement hereafter made to change or modify, or to discharge in whole or in part, any contract, obligation, or lease, or any mortgage or other security interest in personal or real property, shall not be invalid because of the absence of consideration:  Provided, ***That the agreement, changing, modifying, or discharging such*** contract, obligation, lease, mortgage or ***security interest shall not be valid or binding unless it shall be in writing and signed by the party against whom it is sought to enforce the change, modification, or discharge***.

(Doc. #59 at 5 (quoting M.C.L. 566.1) (emphasis added by Akouri)).  Akouri argues, then, that where there admittedly was no consideration provided for its alleged agreement to subordinate its security interest,[18] any such agreement – to change, modify, or discharge this security interest – must be in writing to be enforceable.  (*Id.*).  Courts have recognized that "a subordination

---

[17] Akouri disputes Mark's assertion that such a verbal promise was made, claiming that Mr. Akouri specifically advised Mark that he would not agree to subordinate Akouri's security interest to Mark's.  (Doc. #59 at 4-5).  The record also contains two affidavits executed by Rotondo, one in which he attests that Akouri never subordinated its liens to Mark's, and another retracting and disavowing this statement.  (Doc. #45 at 97-98; Doc. #53-6).  Although the Court is not particularly persuaded by Mark's unsupported assertion that Akouri verbally agreed to subordinate its security interest to his, the Court must accept this assertion as true for purposes of resolving the pending motions.  *See Ciminillo*, 434 F.3d at 464 (court must assume the truth of the non-moving party's evidence at the summary judgment stage).

[18] Mark asserts that Akouri had "good reason" to agree to subordinate its security interest – namely, that Mr. Akouri knew that the Mark Loan was being used to pay the IRS, and knew that the IRS could seek to impose liability against him personally as a result of Apex Admin's and PPMSG's failure to pay taxes.  (Doc. #53 at 9).  Even assuming this is true, however, Mark does not allege that any legally cognizable consideration was provided to Akouri in connection with its purported agreement to subordinate its security interest.

agreement is nothing more than a contractual modification of lien priorities …." *Matter of Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. Apr. 28, 1992). Thus, subordination agreements (*i.e.*, agreements to contractually modify or change existing security interest priorities) fall within M.C.L. 566.1's province and must be in a signed writing to be enforceable. Because Mark admits that there is no written subordination agreement signed by Akouri, there is no material question of fact that Akouri's security interest in the assets of Apex Admin is senior to Mark's.[19]

### b.   *Akouri's Interest in the Consulting Fees*

The Court next must determine whether Akouri's senior security interest in the assets of Apex Admin translates into a senior security interest in the assets of the Directional Entities (which are the entities that purportedly owned the Customer Accounts sold to the AES Plaintiffs).

M.C.L. 440.9502(1) governs the contents of a UCC financing statement, which must be filed with the Michigan Department of State in order to perfect a creditor's security interest in property. Subsection (a) states that such a financing statement is sufficient only if it "[p]rovides the name of the debtor." M.C.L. 440.9502(1)(a). Here, Akouri's May 9, 2011 financing statement identifies the debtors as "People Plus Management Services Group, LLC" and "Apex Administrative Services, LLC." (Doc. #45 at 68-69). It is undisputed that none of Akouri's UCC financing statements identify any of the Directional Entities as a "debtor." Therefore, the IRS argues that the Akouri Loan was secured only by the assets of PPMSG and Apex Admin, neither of which (it claims) owned the Customer Accounts that were sold to the AES Plaintiffs.

---

[19] Judge Alexander reached this same conclusion in the State Court Action. (Doc. #58-1 at 5-6 ("Based on this statute [M.C.L. 566.1], [Akouri] argues that the Mark Defendants cannot succeed on their theory that [Akouri] subordinated its interest absent a writing so indicating – and no such writing exists. The Court agrees.")).

(Doc. #49 at 6-8).  According to the IRS, then, it is entitled to the Consulting Fees because it filed notices of federal tax liens against the Directional Entities,[20] which are the entities that actually (allegedly) owned the Customer Accounts sold to the AES Plaintiffs.  (Doc. #44-1 at 16-17).[21]

(1)     Akouri's Security Interest is in the Assets of
Apex Admin, Not the Assets of the Directional Entities

Akouri alleges that, by perfecting a security interest in the assets of Apex Admin, it perfected a security interest in the assets of the Directional Entities because "four of the assets that Apex Admin owned as personal property were its [100%] membership interests in the 'Directional Entities.'"  (Doc. #52 at 25 (emphasis added)).  Specifically, Akouri points to the security agreement it executed with Apex Admin, by which Akouri was granted "a continuing security interest in and to all of [Apex Admin's] right, title and interest in all of its property of any kind or description, tangible and intangible personal property, assets and rights, wherever located, whether now existing or owned or hereafter arising or acquired and the proceeds and products therefrom …."  (*Id.* at 99-113).

In support of this proposition, Akouri relies on M.C.L. 450.4504(1), which provides that, "A membership interest [in a limited liability company] is personal property and may be held in any manner in which personal property may be held."  (*Id.* at 16).  According to Akouri, then, its security interest in all of Apex Admin's "assets" translates not only into a security interest in Apex Admin's membership interests in the Directional Entities, but also into the specific assets of the Directional Entities, including the Customer Accounts that they allegedly sold to the AES

---

[20] Nearly all of the IRS' federal tax liens were filed against the Directional Entities before the Customer Accounts were sold in the March 28, 2013 agreements.  (Doc. #44-2 at ¶¶4-9).

[21] The AES Plaintiffs (and Rotondo at oral argument) take the position that the IRS is entitled to the Consulting Fees (although the AES Plaintiffs maintain that this amount should be reduced by the amount of costs and attorneys' fees).  (Doc. #50 at 11).

24

Plaintiffs (which are generating the Consulting Fees at issue).  This argument is wholly lacking in merit.

The IRS properly argues that Akouri's security interest in Apex Admin's membership interest in the Directional Entities did not give Akouri any interest in the Directional Entities' specific property (i.e., their Customer Accounts).  (Doc. #58 at 4-5).  The IRS' position is supported by the plain language of Michigan's Limited Liability Company Act, which states that "[a] member has no interest in specific limited liability company property."  (*Id.* at 5 (citing M.C.L. 450.4504(1)-(2))).  According to the IRS, because Apex Admin had no interest in the specific limited liability company property of the Directional Entities, Akouri's security interest in Apex Admin extended only to Apex Admin's membership interest in the Directional Entities, but not one step further to the Directional Entities' specific property, such as the Customer Accounts that they purportedly sold to the AES Plaintiffs.  (*Id.*).

The Court agrees that Akouri is impermissibly blurring the distinction between a security interest in a membership interest in a limited liability company, and a security interest in the assets of that limited liability company.  M.C.L. 450.4504 provides as follows:

> (1)    A membership interest [in a limited liability company] is personal property and may be held in any manner in which personal property may be held ….
>
> (2)    A member has no interest in specific limited liability company property.

M.C.L. 450.4504.  Thus, if a member has no interest in the assets of a limited liability company, it follows that a member's creditor – who has a security interest in the member's membership interest – cannot have any interest in the assets of the limited liability company either.  This is precisely what Judge Alexander concluded when presented with this same question in the State Court Action:

> It is apparent that [Akouri's] allegations against AES are founded on the premise that it has a security interest in **the assets** of the Directional Entities.  As argued by the AES Defendants, however, there is a difference between a **security interest in a membership interest** of these entities (as an asset of Apex Administrative) and a **security interest in the assets** of the entities themselves.
>
> [Akouri] filed UCC financing statements that perfected its security interest in "all assets" of both People Plus and Apex Administrative.  The Directional Entities were wholly owned by Apex Administrative.  As a result, [Akouri] had a security interest in a membership interest of the Directional Entities.  But neither the language of the Security Agreements, nor the UCC Financing Statement, gave [Akouri] a security interest in the actual assets (such as the customer lists) of the Directional Entities.
>
> As a result, because each of [Akouri's] claims against [AES] hinges on a claim that AES purchased assets subject to [Akouri's] perfected security interest, and the Court has concluded otherwise, [Akouri's] Complaint against [AES] must be dismissed.   [Akouri] simply advances no alternative theory for [AES] (as purchasers of assets not subject to [Akouri's] security interests) being included in this case.

(Doc. #63-2 at 7-8).  This Court concludes – as did Judge Alexander – that Akouri did not have a security interest in the Directional Entities' specific assets.[22]  *See, e.g.*, *In re Hopkins*, 2012 WL 423916, at *1 (Bankr. W.D. Mich. Feb. 2, 2012) (recognizing that debtor's 100% membership interest in an LLC was part of his bankruptcy estate, but property owned by that LLC was not).

(2)     A Question of Fact Remains as to Whether
Akouri Has a Claim to the Consulting Fees

Unfortunately, the foregoing analysis does not answer the ultimate question of which party is entitled to the Consulting Fees.  Akouri argues that even if the Court finds that it had no security interest in the assets of the Directional Entities, summary judgment in favor of the IRS is still inappropriate for multiple reasons.

---

[22] In a supplemental brief, the AES Plaintiffs argue that this Court should give preclusive effect to Judge Alexander's conclusion in this regard.  (Doc. #67 at 4-8).  Akouri disagrees (Doc. #74 at 3-6), arguing that Judge Alexander's ruling is not a "final order" for purposes of res judicata or collateral estoppel (Doc. #76).  Because this Court is not giving preclusive effect to Judge Alexander's findings – but, rather, is simply reaching the same result based on application of the same legal principles – it need not resolve this issue.

First, Akouri argues that there remains a question of fact as to whether the Directional Entities or Apex Admin actually owned the Customer Accounts that were transferred to the AES Plaintiffs. (Doc. #61 at 2). The Court agrees that ownership of these Customer Accounts is a critical issue to the resolution of this action. If the evidence conclusively establishes that the Directional Entities owned the Customer Accounts at issue, as the AES Plaintiffs allege, then Akouri would have no claim to the Consulting Fees and summary judgment in favor of the IRS would be appropriate. However, if, as Akouri claims, the evidence were to establish that the Customer Accounts were actually owned by Apex Admin, Akouri would arguably have a claim to the Consulting Fees as a result of its priority security interest in the assets of Apex Admin.

The AES Plaintiffs have consistently claimed that they purchased the Customer Accounts at issue from the Directional Entities. (Doc. #63 at 3). Indeed, they point to the asset purchase agreements, each of which includes a schedule specifically identifying the seller of each Customer Account. (*Id.* (citing Doc. #63-3)). Together, these schedules identify 67 accounts purportedly sold by the Directional Entities to the AES Plaintiffs. (Doc. #63-3 at 14, 33-34). According to the schedules, none of the Customer Accounts were owned by or purchased from Apex Admin. (*Id.*).

Akouri argues, however, that these schedules are insufficient to establish ownership of the Customer Accounts and asserts that the AES Plaintiffs have never produced the actual customer contracts allegedly purchased from the Directional Entities. (Doc. #74 at 2). In a supplemental brief filed after oral argument, Akouri asserts that it requested from the AES Plaintiffs – through discovery in the State Court Action – documents "relating to the Asset Purchase Agreement and the negotiation, execution, and implementation of the Agreement, including, but not limited to, all contracts and the agreements relating to the customer lists

purchased by [the AES Plaintiffs]."  (Doc. #74-1 at 5).  Akouri maintains that, despite requests for copies of these customer contracts (including via the filing of a motion to compel), the AES Plaintiffs have consistently relied only on the schedules discussed above as "evidence" that the Customer Accounts were owned by the Directional Entities.  (Doc. #50-2 at 13-14, 32-34).[23] Akouri asserts that, "Without examining the contracts that the [the AES] Plaintiffs claim [Akouri] had no lien against, there is no way for [Akouri] or this Court to see if that is true."[24] (Doc. #61 at 2).  The Court agrees.  Although the AES Plaintiffs have maintained that the Customer Accounts at issue were owned by the Directional Entities (Doc. #63 at 3), they have provided no evidence which conclusively establishes that this was in fact the case.  This fact is particularly striking because producing the customer contracts – assuming they substantiate the AES Plaintiffs' assertions – should have been a simple and effective way to eliminate any dispute over the critical issue of the ownership of these Customer Accounts.

In its reply brief, the IRS argued – for the first time – that even if Apex Admin (and not the Directional Entities) owned the Customer Accounts at issue, the IRS is still entitled to the Consulting Fees by virtue of prior federal tax liens filed against an entity named Assured Source

---

[23] Counsel for Rotondo indicated at oral argument his belief that the Directional Entities owned the Customer Accounts at issue.  He further indicated that an "allocation schedule" had been filed with the IRS detailing which Customer Accounts belonged to which particular Directional Entities; he claims that this schedule was not produced in discovery because it was not requested. Here, where Rotondo did not file responses to any of the pending motions, or otherwise weigh in on the matters before the Court in writing, the unsubstantiated statements of his attorney are not competent evidence which the Court may consider in determining ownership of the Customer Accounts at issue.

[24] Of the 67 customer contracts at issue, the AES Plaintiffs have provided the Court with only two – one with AS Holdings and one with AS South.  (Doc. #67 at Ex. O).  As Akouri points out, however, both of these contracts are with the same customer (AMTEC, LLC), and neither is signed by the client.  Thus, these two contracts do little to substantiate the AES Plaintiffs' claims that the Directional Entities owned the Customer Accounts at issue.

PEO, LLC ("Assured Source").[25]  (Doc. #58 at 5-7).  According to the IRS, after it filed these

liens, Assured Source ceased operating in December 2010 and, within one month, a newly

formed company (Apex Admin) took over Assured Source's clients.  (*Id.* at 6-7).  The IRS

claims, then, that its tax liens against Assured Source attached to all of that company's property,

including its Customer Accounts.  (*Id.* at 7).  It asserts that these assets were never discharged

from the tax liens prior to Apex Admin obtaining the Customer Accounts, and, therefore, the

federal tax liens "continue to encumber the assets traceable to those client lists today and are

senior to any security interest alleged by Intervenor Akouri."  (*Id.*).  Although it is certainly

possible that the IRS is correct in this regard, and that Akouri's success on its argument that

Apex Admin owned the Customer Accounts at issue could nevertheless result in an adverse

finding on the broader issue of entitlement to the Consulting Fees, this issue is not ripe for a

determination at this juncture, particularly where Akouri has not had the opportunity to take

discovery regarding the Assured Source entities.  Accordingly, at least at this time, summary

judgment in favor of either Akouri or the IRS is inappropriate.[26]

---

[25] On the eve of oral argument on the pending motions, Akouri filed a motion to strike the IRS'
reply brief, arguing that the IRS should not be permitted to raise the argument regarding Assured
Source for the first time in a reply brief, particularly where the documents on which the IRS
relies were not produced in discovery.  (Doc. #64).  The IRS filed a response to this motion,
arguing that the "tax liens against the Assured Source entities were not placed in issue by the
pleadings" in this case, and that discovery was not sought regarding these entities.  (Doc. #65).
The Court agrees with the IRS that it was not until Akouri advanced its theories – that the
Customer Accounts actually belonged to Apex Admin (not the Directional Entities) and/or that
the Directional Entities were sham companies such that the transactions should be voided – that
the IRS could determine that its tax liens against Assured Source could be pertinent.  Thus, **IT IS
ORDERED** that Akouri's motion to strike the IRS' reply brief **(Doc. #64) IS HEREBY
DENIED**.

[26] Akouri also argues that summary judgment in favor of the IRS is inappropriate for two other
reasons.  First, Akouri asserts that each of the customer contracts sold to the AES Plaintiffs
contained an "anti-assignment" clause, which required the written consent of the customer in
order to effectuate a valid transfer of the account.  (Doc. #61 at 2).  Akouri contends that the
record contains no evidence that such consents were obtained from the customers at issue and,

## II.     RECOMMENDATION

For the foregoing reasons, **IT IS RECOMMENDED** that the IRS' Motion for Summary Judgment [**44**] and Akouri's Motion for Partial Summary Judgment [**45**] be **DENIED**.  **IT IS FURTHER RECOMMENDED** that the AES Plaintiffs' Motion [**46**] be **GRANTED IN PART** to the extent it seeks to interplead the Consulting Fees, and **DENIED IN PART** to the extent it seeks dismissal and an award of costs and attorneys' fees.   **IT IS FURTHER RECOMMENDED** that the AES Plaintiffs be required to provide an accounting of the Consulting Fees accrued to date.


Dated: July 29, 2015                             s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                              United States Magistrate Judge


## <u>REVIEW</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *See*

---

therefore, that there is a question of fact as to whether the transfer of accounts is valid.  (*Id.*). Second, Akouri alleges that the Directional Entities were "sham" companies and/or that the asset sales were "sham transactions," which should be set aside.  (Doc. #61 at 6-7; Doc. #74 at 6-12). According to Akouri, if it is successful in setting aside the transfer of the assets to the AES Plaintiffs, then it "retains its perfected senior lien status in all of the assets that are generating the revenue that is at issue in this case."  (Doc. #61 at 1-2).  Although the IRS disagrees, the Court finds that, given the competing evidence presented by the various parties, these issues cannot be resolved at the summary judgment stage.

*Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 29, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager